**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Scott Douglas Nordstrom,

                Plaintiff,

v.

Charles L. Ryan, et al.,

                Defendants.

No. CV-11-02344-PHX-DGC

**ORDER**

       Plaintiff Scott Nordstrom is an inmate who is in the custody of the Arizona Department of Corrections ("ADC").  Nordstrom is held in the Browning Unit of ADC's Eyman Complex.  Defendant Charles Ryan is the Director of ADC.  Nordstrom brings this action against Director Ryan under 42 U.S.C. § 1983, alleging violations of his First, Sixth, and Fourteenth Amendment rights based on ADC's inspection of his outgoing legal mail.

       The Court denied Nordstrom's motion for a preliminary injunction (Doc. 22) after an evidentiary hearing.  Doc. 43.  During a subsequent telephone conference, the parties agreed that, following discovery, the Court could resolve this case on the merits without additional in-court testimony.  Doc. 52.  The parties submitted simultaneous merits briefs (Docs. 67, 69) and simultaneous response briefs (Docs. 73, 74), and the Court heard oral arguments on January 22, 2016 (Doc. 80).  For the following reasons, the Court will deny Plaintiff's request for a declaratory judgment and permanent injunction, and enter judgment in favor of Defendant.

## I.      Background.

As background, this order will cite from the Ninth Circuit's decision in this case, using the ninth Circuit's emphasis.

On May 2, 2011, Nordstrom notified Correctional Officer F. Hawthorne that he had outgoing legal mail to be processed.  *Nordstrom v. Ryan*, 762 F.3d 903, 907 (9th Cir. 2014).  The letter was addressed to Sharmila Roy, Nordstrom's court-appointed lawyer handling the appeal of his murder conviction and death sentence.  *Id.*  Nordstrom alleged that Hawthorne removed the two-page letter from the envelope and read its contents in his presence.  *Id.*  Nordstrom asked Hawthorne to stop reading his attorney-client letter, and alleges that Hawthorne responded by saying "[d]on't tell me how to do my job; I am authorized to search legal mail for contraband as well as scan the content of the material to ensure it is of legal subject matter."  *Id.*  Hawthorne returned the letter to Nordstrom, who sealed it and placed it with the outgoing mail.  *Id.*

Nordstrom filed a grievance based on Officer Hawthorne's actions.  *Id.*  Director Ryan responded to Nordstrom's final appeal by citing the relevant portion of ADC's legal mail policy, Order 902.11, that was in force at that time:

> 1.4.2.2 All outgoing letters to an inmate's attorney or to a judge or court shall be brought to the mail room by the inmate, where the letter shall not be read or censored but shall be inspected for contraband and sealed in the presence of the inmate.

*Id.*  "In denying Nordstrom's grievance, [Director] Ryan reasoned that '[s]taff is authorized to scan and *is not prohibited from reading the mail* to establish the absence of contraband and ensure the content of the mail is of legal subject matter.'"  *Id.*

Nordstrom filed a pro se § 1983 lawsuit against several defendants, including Director Ryan and Officer Hawthorne.  Doc. 1 at 1-2, 4.  Nordstrom alleged violations of his First, Sixth, and Fourteenth Amendment rights based on Officer Hawthorne's actions, Director Ryan's response to his grievance, and ADC's legal mail policy.  *Id.* at 3-11.  Consistent with the Prison Litigation Reform Act, 28 U.S.C. § 1915A, this Court

screened Nordstrom's complaint.  The Court held that Nordstrom failed to state a claim because he failed to allege any actual injury or prejudice resulting from Director Ryan's and Officer Hawthorne's actions, and because prison officials are permitted to check outgoing legal mail for the presence of contraband and illegal activities.  Doc. 4 at 4-5. The Court dismissed Nordstrom's complaint, but granted leave to amend.  *Id.* at 5-6. Nordstrom filed an amended complaint (*see* Doc. 5), which the Court dismissed on the same grounds (*see* Doc. 7 at 3-5).  Nordstrom was not granted leave to amend.  *Id.* at 5.

Nordstrom appealed the dismissal to the Ninth Circuit.  *Nordstrom*, 762 F.3d at 907.  Because Nordstrom alleged that Officer Hawthorne read a letter related to his murder conviction and death sentence appeal, the court of appeals found that his claim implicated the Sixth Amendment.  *Id.* at 909.  The Ninth Circuit held that a Sixth Amendment violation had occurred if, as Nordstrom alleged, ADC guards were reading, rather than "merely inspecting or scanning," inmate legal mail.  *Id.* at 906.  The Ninth Circuit held that Nordstrom's Sixth Amendment claim could survive § 1915A screening based on his "allegations that prison officials read his legal mail, that they claim entitlement to do so, and that his right to private consultation with counsel has been chilled."  *Id.* at 911.  The court of appeals did not reach Nordstrom's First or Fourteenth Amendment claims.  *Id.* at 909.[1]

On remand, Nordstrom filed a motion for preliminary injunction (Doc. 22), which Defendants opposed (Doc. 28).  The Court held an evidentiary hearing on March 12, 2015 and received testimony from Scott Nordstrom, Emily Skinner, Clint Davis, Brandon Nail, Daniel McClincy, Hope Ping, and Carlos Reyna.  Doc. 43 at 1.  At the end of the hearing, the Court denied Nordstrom's motion for preliminary injunction from the bench. Docs. 43 at 1; 67-9 at 238.  The Court found that Nordstrom was unlikely to succeed on

---

[1] Defendant asserts that Nordstrom failed to preserve his First and Fourteenth Amendment claims.  *See* Doc. 67 at 20.  The Court does not agree.  The court of appeals reversed the dismissal of this case for failure to state a claim, and did not specify that it was reversing only the dismissal of Nordstrom's Sixth Amendment claim.  *See* 762 F.3d at 912.  The Court therefore concludes that Nordstrom's amended complaint has been reinstated in full, including his claims under the First and Fourteenth Amendments.

the merits because, based on the evidence presented at the hearing, it appeared that ADC's policies and practices were compliant with the Ninth Circuit's directives in *Nordstrom* and the Supreme Court's decision in *Wolff v. McDonnell*, 418 U.S. 539 (1974).  *See* Doc. 67-9 at 233-38.

After the hearing, the parties stipulated to the dismissal of Defendants Ramos and Hawthorne.  Doc. 47.  The Court granted the stipulation.  Doc. 49.  As a result, Director Ryan is the sole remaining Defendant.

## II.     Findings of Fact.

### A.     ADC's Penological Interests.

The Court heard testimony from Clint Davis, a 21-year detective in the gang unit of the Phoenix Police Department, and Carlos Reyna, the Special Security Unit coordinator for ADC's Eyman Complex.  On the basis of their credible testimony, the Court finds that ADC has legitimate interests in maintaining institutional security and preventing gangs and criminal organizations from using its facilities to run their operations.

Nearly all of the investigations of ongoing criminal activity by the Phoenix Police Department's gang unit implicate persons in local jails or state or federal prison facilities. Doc. 67-9 at 95.  The gangs are active in prisons and jail.  The Arizona Mexican Mafia ("AMM"), for example, actually runs its sophisticated criminal enterprise from prison – the ADC's Browning Unit, colloquially known among law enforcement as "the Hive." Docs. 67-9 at 114-15; 67-11 at 12.  The AMM's criminal operations require regular communications between the Hive and the outside world.  Docs. 67-9 at 115-16; 67-11 at 12.  The AMM uses violence, fear, and intimidation to attempt to control the prisons, jails, and streets.  Doc. 67-11 at 12.

One of the ways prison gang members communicate with the outside world is through misuse of the attorney-client privilege.  By communicating under the guise of the privilege, criminal organizations seek to conceal criminal conduct and conspiracies from prison officials and law enforcement.  Docs. 67-9 at 112; 67-11 at 9.  Officer Davis

testified that the problem is particularly bad in Arizona.  He personally has seen inmates misuse legal mail "thousands" of times.  Doc. 67-9 at 97-99.  He described the problem as "rampant," and explained that inmates "are continually abusing the attorney-client privilege, including legal mail, to further their criminal objectives."  *Id.* at 117-18.  Officer Reyna testified that he encounters "attempts by inmates to commit criminal acts using legal mail" on a "daily basis." *Id.* at 199.  Officer Davis testified that these abuses have facilitated numerous felony crimes and attempted crimes, including money laundering, drug trafficking, homicide, extortion, and arson. *Id.* at 99.  Officer Davis also noted that many crimes have been prevented because inspecting officers were able to detect the planned crimes in illegitimate legal mail.  *Id.* at 100-01.  He testified that gangs, criminal organizations, and inmates are aware of the legal mail inspection process, and they attempt to use this knowledge to conceal criminal communications and contraband from inspecting officers. *Id.* at 97, 206.

At the hearing, Defendant offered exhibits to show how inmates use their knowledge of the legal mail inspection process to try to obtain contraband while in prison.  In one exhibit, an inmate sent a letter to an associate containing detailed instructions on how to send contraband – including a cellular phone, a razor blade, and drugs – into the prison by disguising it to look like legal mail.  *See* Ex. 126 at 8-10;[2] *see also* Doc. 67-9 at 210-16.  The inmate told his associate to "[f]ollow my instructions down to the T. . . . I know this [process] works [be]cause I did it when I was in Yuma." Ex. 126 at 7.  The inmate told his associate to hide the contraband in a stack of "about 950 pages of caselaw" printed from Westlaw. *Id.* at 8.  He provided detailed instructions on how to wrap and package the contraband to avoid detection. *Id.* at 8-9.  He provided sample labels from a legitimate law office with a diagram illustrating where the labels should be placed on the envelope to make the package look authentic. *Id.* at 5, 10.  The instructions specified that the package must be sent from Phoenix because that is where

---

[2] Citations to exhibits refer to exhibits admitted during the March 12, 2015 evidentiary hearing on Nordstrom's motion for preliminary injunction. *See* Doc. 44.

the law office is located.  *Id.* at 9.

In another exhibit, an inmate sent instructions detailing how to mimic legitimate legal mail to conceal contraband.  *See* Ex. 133 at 2-3; *see also* Doc. 67-9 at 171-75.  The letter began with language that could appear in authentic legal mail: "[p]lease be advised that I recently obtained the copy of your 'Petition for Review' in which you filed in the Div. #2 court of appeals on my behalf."  Ex. 133 at 2.  The tone of the language changed, however, in the middle of the second paragraph, with the inmate admitting: "I've given this correspondence the appearance of legal mail."  *Id.*  The inmate then instructed his associate to hide contraband in a stack of caselaw to avoid detection.  *Id.* at 2-3.  He directed his associate to use the return address of a legitimate law firm.  *Id.* at 3.  The inmate emphasized that the letter must be "meter stamped" at a post office in order to look authentic.  *Id.*  The inmate also provided a phone number for a contact from whom the "the finished product" could be obtained.  *Id.*  At the end of the letter, the inmate resumed the professional tone to match the introduction.  *Id.*

Defendant also provided evidence of several specific instances of inmates abusing their right to send and receive legal mail to attempt to facilitate criminal acts.  Two such instances involved members of the AMM.  In one, an inmate who was a member of the AMM attempted to use his pro per status to send bogus legal mail to facilitate the murder of a police officer in Glendale.  Doc. 67-9 at 104.  In the other, an inmate's outgoing legal mail contained what, on first glance, appeared to be a legitimate legal document – a motion in limine prepared by licensed attorneys.  *See* Ex. 107 at 4.  But the inmate had added micro-writing between the lines of the motion's text on the second page.  *Id.* at 5.  The inmate's micro-writing contained detailed directions to his associates who were not incarcerated to carry out a number of criminal acts.  *Id.*; *see also* Docs. 67-9 at 118-22; 67-11 at 2.  The inmate told them to "pay a visit to Turtle and let him know you have a [message] from" the inmate.  Ex. 107 at 5.  The message was that the AMM "controls the drug trade within the walls of the state and federal system," which includes all "raza dealers" in the streets.  *Id.*  As a result, Turtle was to be told that he owed the AMM

monthly payments.  *Id.*  If he refused, the inmate's associates were to burn down one of Turtle's shops and check back with him.  *Id.*  If he refused again, they were to burn down another shop.  *Id.*  The inmate also told his associates that they "need 2 Glock 21 .45 caliber [handguns] and an AK47 [assault rifle]" with extra magazines for each weapon, and "3 vests preferably with metal plates."  *Id.*  The inmate advised his associates to "use latex gloves, zipties, and mask[s] if you keep them alive," but he understood that it is "really best to take 'em out, less stress."  *Id.*  Inspecting officers discovered the micro-written directions during an outgoing legal mail inspection and prevented these crimes from occurring.  Docs. 67-9 at 119-22; 67-11 at 20, 26-28.

Defendant submitted two other examples involving another gang, the Aryan Brotherhood.  In the first, a member of the Aryan Brotherhood sent an inmate a typewritten letter on a law firm's letterhead.  *See* Ex. 104; *see also* Doc. 67-9 at 199-206. The letter contained coded messages discussing gang business, including plans to expand the gang's criminal activities and to institute a new leadership structure.  *See id.*  The letter was discovered because its postmark did not match the law firm's address on the envelope and letterhead.  Doc. 67-9 at 199-201.  In the second example, an associate sent an inmate a letter with caselaw from what appeared to be a legitimate law firm.  *See* Exs. 121-22; *see also* Doc. 67-9 at 206-10.  The letter contains two different fonts, with professional sounding language in one font and coded gang messages in the other. Ex. 122 at 1.  The letter has several pages of caselaw attached to it.  *Id.* at 2-12.  In the middle of the caselaw, however, is the Aryan Brotherhood's "roll call," or member roster. *Id.* at 5-9; *see also* Doc. 67-9 at 209-10.

On the basis of these exhibits and related testimony, the Court finds that some inmates clearly attempt to misuse incoming and outgoing legal mail to facilitate criminal activity inside and outside the prison system.  Prison officials and law enforcement have a legitimate interest in detecting such communications.

Unfortunately, criminal activities sometimes also include attorneys or their assistants.  Defendant provided four examples.  Attorney Jason Keller provided AMM

inmates with drugs, cell phones, and other contraband.  Doc. 67-9 at 105.  Attorney David DeCosta passed inmates legal pads containing heroin and methamphetamine.  *Id.* at 106-07.  Attorney Carmen Fischer – who has appeared in this Court many times – provided financial support to the AMM and passed information between gang members. *Id.* at 107-08.  Fischer was later charged with, and convicted of, felonies for her actions. *Id.* at 108.  Mitigation specialist Jessica Mukavetz passed communications and prison contraband to an inmate.  *Id.* at 108-09.  These examples show that prison officials cannot protect against illegal communications or the passing of contraband merely by ensuring that communications are to or from a licensed attorney or their assistants.

Nordstrom argues that Defendant has presented no specific instance where an inmate has included criminal communications in a letter to or from a legitimate licensed attorney.  Doc. 69 at 12.  Although it is true that the foregoing evidence does not include such an example, the Court cannot conclude that the ADC faces no risk of such communications.  The evidence amply shows that some inmates misuse legal mail for illegal purposes, and that some lawyers are complicit in inmate crimes.  From these facts, the Court finds that the ADC faces a legitimate risk that legal mail – even when sent to or from licensed attorneys – might include communications regarding crimes inside or outside the prison.

**B.    ADC's Legal Mail Policies and Procedures.**

The following findings of fact are based primarily on ADC's legal mail policy, Order 902.11, Director's Instruction 333, and the testimony of Carlos Reyna.  On the basis of Defendant's documentary evidence and Officer Reyna's credible testimony, the Court finds that ADC implemented and followed its legal mail policies and procedures.

ADC's policies and procedures define several relevant terms.  In Order 902, "legal mail" is defined as "[a]ny letters to or from an inmate's attorney as defined above, or to or from a judge or to or from a court of law."  Doc. 67-10 at 22.  In Director's Instruction 333, "contraband" is defined to include "[a]ny non-legal written correspondence or communication discovered as a result of scanning incoming or outgoing legal mail."

Docs. 28-1 at 5; 28-2 at 5; 67-9 at 190.  Thus, non-legal mail disguised as legal mail is considered contraband.

ADC's legal mail policy, Order 902.11, as modified by Director's Instruction 333 on January 8, 2015 (Doc. 28-3 at 2), states in relevant part:

> Staff who process incoming or outgoing inmate mail shall . . . [i]nspect such mail for contraband, stamp the envelope "LEGAL MAIL, ARIZONA DEPARTMENT OF CORRECTIONS" using a commercial stamp, and log it before it is placed in the envelope and sealed by the inmate. . . . All outgoing legal mail shall be brought to the mail room by the inmate, where the letter will be *inspected* for contraband, *but shall not be read by staff*, and *scanned* to ensure it is in fact legal mail. . . . Staff may *inspect* the document but only to the extent necessary to determine if the mail contains contraband, or to verify that its contents qualify as legal mail and do not contain communications about illegal activities.

Docs. 28-1 at 2-3; 28-2 at 2-3 (emphasis added).  The parties have stipulated – and there is no evidence to the contrary – that Director's Instruction 333 was implemented and is followed, and that the prior directive was also implemented and followed.  Doc. 67-9 at 223-24.

ADC requires officers who process legal mail to undergo training.  Inspecting officers are trained to scan legal mail for contraband by looking for keywords or mail that utilizes different fonts, which may indicate an alteration or hidden message.  Doc. 67-9 at 197-98.  Officers are trained not to read letters line-by-line.  *Id.* at 198.

**C.    ADC's Legal Mail Inspection Process.**

The following findings are based primarily on the sworn testimony of Plaintiff Scott Nordstrom; Brandon Nail, a correctional officer who inspects legal mail in the Browning Unit; Daniel McClincy, a 19-year sergeant who supervises the unit in charge of processing inmate mail at the Eyman Complex; Hope Ping, the associate deputy warden who was previously the chief of security of the Browning Unit; and Carlos Reyna.

The inspection of outgoing inmate legal mail begins as follows.  An inmate places the legal mail in an unsealed envelope.  *Id.* at 51.  The inmate hands the unsealed envelope to a correctional officer in the mail office or, if the inmate does not have access

to the mail office, to an officer who is collecting legal mail.  *Id.*  The officer removes the letter from the envelope and inspects it.  *Id.*

The Court heard testimony from Sergeant McClincy, supervisor of mail for the Eyman Complex.   McClincy described the process for inspecting legal mail in the following testimony, which the Court found credible:

> Q:   In your experience and understanding of the process of inspecting legal mail, what happens – what's supposed to happen when an officer opens the envelope and looks at that first page?  What's supposed to happen?
>
> A:   For incoming legal mail?
>
> Q:   Let's say outgoing legal mail.
>
> A:   Well, inmates do not have access to typewriters, so you're going to be looking at handwritten material.  Most inmates do not have the clearest handwriting, whether it's printed or cursive.
>
> So for your average officer to open up a multiple-page document on a piece of notebook paper written in cursive, it takes a little bit of time to even ascertain what you're looking at, whether it's even legible or not.
>
> What is supposed to happen is they are – well, again, supposed to inspect that document page by page, one at a time, for the presence of contraband, obviously contraband, whether it qualifies as legal mail, or whether there's any kind of communications in there that indicate criminal activity.  It should take, in my own estimation and experience, about 15 seconds per page for an experienced officer.
>
> For someone who is not quite experienced at reading handwriting, it could take longer.  It could take 30 seconds to go from a top of a page to the bottom of a page just to determine any words at all.  Like I said, some of the handwriting is not very clear.
>
> Page by page, flip it over, next page, flip it over.
>
> Once they have reached the end of the document, they fold it back up in the presence of the inmate, right back in, and then the inmate will seal it.
>
> Policy states that it shall be sealed in the presence of the inmate.  It doesn't state by who[m] and most officers will have the inmate seal the envelope himself.
>
> Q:   When the officer is looking at an individual page, is the officer

supposed to read line by line what the inmate is saying?

A:      Certainly, not.  And the policy does not say that they are to read for outgoing mail.

And Director's Instruction 333.

The word "scanned" is included with "inspect for" on outgoing mail.

On incoming mail, it's quite different.  The word scan does not exist at all.  We are to inspect only to determine its validity and presence of contraband.

For outgoing, it does say that we are to scan.

"Scanning" doesn't mean reading.  You are looking for key components; inmate nomenclature.  Inmates have a way of speaking that uses slang, that using vernacular.  There's keywords that you can look for.

For instance: Hey homie, hey brother, hey partner – Things like that in the greeting.

You are looking for these things.  You're looking for . . . Security Threat Group information, anything that might refer to a street gang or prison gang.  You are looking for codes.  You're looking for alpha codes or numerical codes, things that you might not understand at first glance.

A legitimate piece of legal mail at a very quick, cursory glance, is going to be very easy to determine.

Very professionally handwritten with proper terms, proper titles being used, no terms of endearment being used.

Even a fairly inexperienced officer can pick out a legitimate piece of legal mail in a very short period of time.

Doc. 67-9 at 167-70.   Officers Davis, Nail,[3] Ping, and Reyna provided similar descriptions of inspecting or scanning legal mail.  *See id.* at 140, 147-48, 191-92, 197-98.

---

[3] At oral argument, Nordstrom emphasized that Officer Nail testified during the evidentiary hearing that "the definition of 'scanning' is to hastily read something." Doc. 67-9 at 155.   From this statement, Nordstrom asks the Court to conclude that inspecting officers read, rather than scan and inspect, legal mail.  The Court declines this finding for two reasons.  First, Officer Nail clarified this definition to mean "the part of scanning . . . that you have to identify certain words to make sure that [the legal mail] is not contraband."  *Id.*  Second, this isolated statement is not enough to overcome Officer Nail's overall testimony, which the Court found credible, that inspecting officers do not read inmates' legal mail during the inspection process. *See id.* at 147-48.

- 11 -

Once the officer has completed the inspection, the officer places the letter in the envelope and returns it to the inmate, who seals the envelope.  *Id.* at 51-52; 188-89.  The inmate returns the sealed envelope to the officer, who places it in the Eyman Complex's mail and property room.  *Id.* at 52.  There, officers prepare it to be transferred to the Florence post office within 24 hours of leaving the inmate's possession.  *Id.* at 52-53; 165-66.  The officers stamp the mail, log it as legal mail, and place it in a lockbox for safekeeping until it is transferred to the post office.  *Id.* at 52, 165-66.

If the inspection reveals what appears to be contraband in legal mail, the officer does not continue reading the letter.  Instead, he or she seizes the letter and allows a superior officer to handle it.  *Id.* at 162-63.  Ultimately, the Special Security Unit will be brought in to open the mail in the inmate's presence.  *Id.* at 179-80.  If a lawyer may be implicated in wrongdoing, the Central Investigation Unit will conduct an investigation to determine whether the lawyer is culpable.  *Id.* at 180.

Although Nordstrom and other death-row inmates believe otherwise, there is no evidence that inspecting officers provide to prosecuting authorities any information gleaned from legal mail.  Docs. 67-1 at 38-39; 67-2 at 12; 67-9 at 148-49, 185-86, 198-99.  Were that to occur, McClincy and Reyna both testified credibly that a supervisor would be required to file a complaint against the offending officer, who likely would be disciplined or fired for his actions.  Doc. 67-9 at 185-86, 199.

**D.     Specific Instances of Legal Mail Inspection.**

The following findings of fact are based primarily on the sworn testimony of Nordstrom and Nail, as supplemented by the declarations of other Browning inmates. With respect to the two instances of legal mail inspection identified by Nordstrom, the Court makes the following findings of fact.

On May 2, 2011, Nordstrom gave Hawthorne a legitimate piece of outgoing legal mail for inspection.  *Id.* at 56-57.  Hawthorne inspected the two-page letter for about 15 seconds.  *Id.* at 40.  Nordstrom asked him to stop reading his legal mail, stating that it was protected by the attorney-client privilege.  Docs. 3 at 4-14; 67-9 at 40.  Nordstrom

believed Hawthorne was reading the letter because "his eyes [were] on the words of the page."  Doc. 67-9 at 40.  Nordstrom disputes that the letter was processed as legal mail (*id.* at 59), but admits that the letter was delivered to his attorney (*id.* at 68).

On November 13, 2014, Officer Nail delivered a letter that was marked as legal mail to Browning inmate Bryan Hulsey.  Docs. 23 at 3-4; 67-9 at 149.  Nail opened the envelope in front of Hulsey and examined the envelope for contraband.  Doc. 67-9 at 150.  Finding none, he passed the envelope to Hulsey and turned to the letter.  *Id.*  Nail was surprised to see that the letter was handwritten because, in his experience, letters from attorneys are usually typed.  *Id.* at 150-51.  During Nail's scan of the letter, two phrases stood out, both of which suggested that the letter was not, in fact, legal mail.  *Id.* at 150.  The two phrases were, to the best of Nail's recollection: "I have never met someone in prison before," and "Bryan, you're such a con."  *Id.*  Hulsey asked Nail to stop reading his legal mail, invoking the attorney-client privilege.  Doc. 23 at 3-4.  Despite his reservations that the letter was not truly legal mail, Nail gave the letter to Hulsey because it did not appear to contain major contraband.  Doc. 67-9 at 150.  Nail later relayed the details of the incident to his supervisor.  *Id.* at 152.

### E.    Chilling of Nordstrom's Attorney-Client Communications.

The following findings of fact are based on the sworn testimony of Nordstrom and his attorney, Emily Skinner.

Nordstrom first began to feel that his ability to communicate with his attorney in writing was chilled after the May 2, 2011 legal mail incident with Hawthorne.  Doc. 67-1 at 15.  Although he had other pending legal proceedings, Nordstrom did not raise this issue in any of those proceedings.  *Id.* at 16-17, 21.  Nordstrom believes that officer inspection of legal mail chills his written communication with his lawyer.  He testified that he will not put certain facts that are relevant to the mitigation phase of his criminal case in letters to attorneys.  Docs. 67-1 at 27; 67-9 at 42-43.  This includes his family history, life experiences, traumatic events, and criminal record.  Doc. 67-9 at 42-43, 48.  Nordstrom testified that he writes his attorneys once a month.  Doc. 67-1 at 29.

Nordstrom's post-conviction lawyer, Emily Skinner, also believes that her ability to communicate with Nordstrom in writing began to be chilled after the May 2, 2011 incident with Hawthorne.  Docs. 67-2 at 11; 67-9 at 76.  Skinner now censors her letters to Nordstrom by omitting sensitive information that she would not want a correctional officer to read.  Docs. 67-2 at 11; 67-9 at 77.  For example, Skinner would not discuss any trauma history that might embarrass her client, such as physical abuse, sexual abuse, or victimization.  Doc. 67-9 at 77.  Nor would she mail an inmate, for example, an investigative report because it might contain some of the keywords that could cause inspecting officers to label it contraband.  *Id.* at 77-78.  Even though Skinner believes that ADC's legal mail policy compromises her ability to represent her clients (*id.* at 89), she is still able to represent them effectively.  *Id.* at 90-91.[4]

Although his written communications with his lawyers are chilled, Nordstrom testified that he can communicate any withheld information by telephone or during in-person meetings with his lawyers.  Docs. 67-1 at 27; 67-9 at 49-50.  But he finds these means of communication to be less effective due to the relative infrequency of attorney visits and telephone calls.  Doc. 67-9 at 73.  Nordstrom also believes that he is better able to communicate in writing because he occasionally experiences anxiety or panic attacks that make it more difficult to communicate in person or by telephone.  Docs. 67-1 at 48-49; 67-9 at 45.  Nordstrom is also more organized when he communicates in writing.  Doc. 67-1 at 48-49.

---

[4] Defendant objects to two pieces of evidence cited in Nordstrom's brief: (1) an appendix purporting to summarize other correctional departments' legal mail policies (*see* Doc. 69 at 22-37); and (2) amicus briefs from the Ninth Circuit proceedings (*see id.* at 10-11).  The Court has reviewed the summaries of legal mail policies from other states, finding that it can take judicial notice of such policies under Federal Rule of Evidence 201, but does not find them particularly helpful.  They do provide context for the issues in this case, but the Court's task is to decide whether the ADC's policies violate the Constitution, not whether they constitute best practices.  *See* 18 U.S.C. § 3626(a)(1)(A).  Nordstrom cites the amicus briefs to bolster his assertions that the attorney-client relationship is weakened when inmates are hesitant to communicate openly with their lawyers, and that written correspondence is one of the most efficient means of inmate-lawyer communication.  Doc. 69 at 10-11.  The Court need not decide whether Nordstrom may cite these briefs because there is already admissible evidence to support these points.  Both Nordstrom and Skinner provided sworn testimony on these precise issues.  *See* Docs. 67-1 at 23, 27, 48-49; 67-2 at 11-12; 67-9 at 42-43, 45, 48, 73, 77-78.

Despite his reluctance to write about certain sensitive subjects in legal mail, Nordstrom's ability to communicate with his counsel has not been undermined.  There is no evidence to suggest, and Nordstrom does not contend, that ADC is monitoring telephone calls or in-person meetings between inmates and their attorneys.  *Id.* at 45. There is evidence that, at one point, Nordstrom was receiving daily visits or telephone calls from his lawyers.  Doc. 67-1 at 33-35.  In-person meetings typically last about two hours.  *Id.* at 30.  Telephone calls typically last about 30 minutes.  Doc. 67-1 at 23-24, 47. Nordstrom testified that "if [his attorneys] requested a phone call, within a few days, a week, I could have a phone call."  *Id.* at 25.  In an emergency, a legal telephone call could likely be scheduled within a day or two.  *Id.* at 47.  There is no evidence that a piece of Nordstrom's legal mail has ever been confiscated.  Doc. 67-9 at 46-47, 65-66.  Although he testified that he is reluctant to put certain types of information in legal mail, Nordstrom has always been able to convey information to his attorneys in one way or another.  Docs. 67-1 at 27, 52; 67-9 at 49-50.[5]

### III.   Legal Principles.

A plaintiff seeking a permanent injunction must satisfy a four-factor test.   In addition to proving the claim on the merits, a plaintiff must show that: (1) he has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for the injury; (3) a remedy in equity is warranted considering the balance of hardships between the plaintiff and defendant; and (4) the public interest would not be disserved by a permanent injunction.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).  Under the Prison Litigation Reform Act:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs.  The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the

---

[5] Defendant asserted that Nordstrom can hand his lawyer written communications during a legal visit without the communication being inspected by officers.  Docs. 67-1 at 52-53; 67-2 at 12-13.  Nordstrom filed a motion to supplement the record disputing this assertion.  Doc. 83.  The Court does not rely on this assertion for its decision.

Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1)(A); *see also Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1152-53 (9th Cir. 2004).

To obtain prospective injunctive relief, a plaintiff "must demonstrate 'that he is realistically threatened by a *repetition* of [the violation].'"  *Armstrong v. Davis*, 275 F.3d 849, 860-61 (9th Cir. 2001) (emphasis and alteration in original) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 109 (1983), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504-05 (2005)).  A threat of repetition can be shown in at least two ways. "First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury 'stems from' that policy."  *Id.* at 861 (quoting *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1237 (9th Cir. 2001)).  "Second, the plaintiff may demonstrate that the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'"  *Id.* (alterations in original) (quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985)).

## IV.    Conclusions of Law.

### A.    Sixth Amendment.[6]

#### 1.    The Correct Legal Test.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. Amend. VI; *Gideon v. Wainwright*, 372 U.S. 335, 342-43 (1963).  In *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Supreme Court held that a prison regulation that permitted prison officials to open and inspect – but not read – incoming legal mail in the prisoner's

---

[6] Defendant argues that Nordstrom lacks standing to assert a Sixth Amendment claim because none of his current lawyers represent him in criminal proceedings.  *See* Doc. 67 at 19-20.  But for standing analysis, the key point in time is the filing of the complaint.  *See Cornett v. Donovan*, 51 F.3d 894, 897 (9th Cir. 1995).  Nordstrom was still involved in criminal proceedings – implicating the Sixth Amendment – when he filed his original complaint.  *See* Doc. 67-1 at 15-17.

presence did not violate the Constitution.  *Nordstrom*, 762 F.3d at 908-09 (citing *Wolff*, 418 U.S. at 577).  The Supreme Court did not address the extent to which prison officials could constitutionally examine or inspect an inmate's legal mail.

This case has produced the Ninth Circuit's most direct treatment of this subject. On appeal from the Court's initial dismissal, the Ninth Circuit began its analysis by recognizing that prison officials have legitimate penological interests in inspecting prisoners' outgoing legal mail for contraband and evidence of illegal activity:

> A prison is no ordinary gated community.  It's a tough place.  Corrections officials obviously have good reason to be on the lookout for contraband, escape plans, and other mischief that could jeopardize institutional security. Officials likewise have every right to *inspect* an inmate's outgoing legal mail for such suspicious features as maps of the prison yard, the times of guards' shift changes, and the like.  Prison officials know what to look for.

*Id.* at 906 (emphasis in original).

The Supreme Court has made similar observations concerning legitimate penological interests in prisoner mail:

> While the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation, the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence.  Perhaps the most obvious example of justifiable censorship of prisoner mail would be refusal to send or deliver letters concerning escape[] plans or containing other information concerning proposed criminal activity, whether within or without the prison.

*Procunier v. Martinez*, 416 U.S. 396, 412-13 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989).

The factual findings set forth above fully support these conclusions.  Defendant presented uncontroverted evidence that inmates in Arizona attempt to conceal criminal communications in mailings designed to look like legal mail.  Officials involved in the monitoring of such activities described the problem as "rampant" and occurring on a "daily basis."  They testified that such communications have been detected thousands of

times, include gangs like the AMM and the Aryan Brotherhood that operate primarily out of prisons, and include crimes such as murder, arson, and extortion.  Officers confirm that correspondence is actually legal mail by scanning the addressee information and the general content of the letter, looking for different fonts, micro-writing, or keywords indicating that a letter may not actually be legitimate legal mail.  *See* Doc. 67-9 at 197-98.  Given these facts, the Court concludes that ADC has a legitimate penological interest in ensuring that the "legal mail" method of communication is used for actual legal mail – that it does not become a readily available method of communicating criminal information subject to less scrutiny.  Without question, the ability to inspect such communications is critical to maintaining prison safety and security, and, as the Supreme Court noted, detecting "proposed criminal activity, whether within or without the prison." *Martinez*, 416 U.S. at 413.

The Ninth Circuit also recognized the importance of an inmate's ability to communicate "candidly and confidentially" with his counsel:

> In American criminal law, the right to privately confer with counsel is nearly sacrosanct.  It is obvious to us that a policy or practice permitting prison officials to not just inspect or scan, but to *read* an inmate's letters to his counsel is highly likely to inhibit the sort of candid communications that the right to counsel and the attorney-client privilege are meant to protect.

*Nordstrom*, 762 F.3d at 910 (emphasis in original; citation omitted).  As the Supreme Court has stated, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution."  *Turner v. Safley*, 482 U.S. 78, 84 (1987).

How, then, should courts reconcile the legitimate interest of prison officials in inspecting legal mail and the legitimate interest of inmates in candid communications with their attorneys?  The Ninth Circuit answered this question by distinguishing between "reading" legal mail on one hand, and "inspecting" or "scanning" such mail on the other hand:

> Corrections officials obviously have good reason to be on the lookout for contraband, escape plans, and other mischief that could jeopardize institutional security.  Officials likewise have every right to *inspect* an

- 18 -

inmate's outgoing legal mail for such suspicious features as maps of the prison yard, the times of guards' shift changes, and the like.   Prison officials know what to look for.  But *inspecting* letters and *reading* them are two different things . . .  What prison officials don't have the right to do is read a confidential letter from an inmate to his lawyer.

*Id.* at 906 (emphasis in original).  The Ninth Circuit reemphasized this point later in the majority opinion:

We emphasize that nothing prevents the ADC from *inspecting* an inmate's outgoing mail, in his presence, to make sure that it does not contain, for example, a map of the prison yard, the time of guards' shift changes, escape plans, or contraband.  What the Constitution does *not* permit, however, is *reading* outgoing attorney-client correspondence.

*Id.* at 910-11 (emphasis in original).

The parties have vigorously debated the meaning of these words.  Nordstrom argues that because the Ninth Circuit has prohibited "reading" legal mail, any reading by a prison official – even of a single word – runs afoul of the Sixth Amendment.  Defendant argues that inspecting or scanning legal mail necessarily entails reading at least some words.  The Court agrees with Defendant.  The Ninth Circuit explained that a prison official may "inspect" legal mail in order to detect escape plans or guard shift changes.  How can that happen unless the official reads at least some of the words?  Suppose, for example, a phrase in the midst of a purported legal letter says: "I will be in the southwest corner of the exercise yard when the helicopter arrives next Thursday at 7:00 p.m."  A prison guard could not detect this escape plan without reading at least some of the words.  Or suppose the letter says "guard shift change at 10:00 p.m."  This communication could not be identified without at least some reading.  The  Court  thus  concludes  that  the prohibited "reading" in the Ninth Circuit's decision does not include reading a few words while scanning a letter for escape plans or other criminal communications.  It means "reading" in the traditional sense – reading the text of the letter line-by-line.[7]

─────────────

[7] At oral argument, Nordstrom quoted language from the Ninth Circuit's opinion stating that guards could inspect outgoing legal mail "for such *suspicious features* as maps of the prison yard, the times of guards' shift changes, and the like."  *Nordstrom,*

1   Permitting prison officials to scan legal mail for indicators of criminal

2   communications, in the inmate's presence, does not serve all interests perfectly. It does

3   not permit prison officials to engage in the kind of line-by-line reading that might be

4   needed to detect every illicit communication, but it does create a reasonable opportunity

5   for officials to detect the kinds of criminal communications that are "rampant" in the

6   Arizona prison system and in which they clearly have a legitimate interest. It has some

7   chilling effect on inmate written communications with their lawyers, but it ensures that

8   review of their legal mail will only occur in their presence and will not involve line-by-

9   line reading. Inmates also have the ability to communicate with their counsel in greater

10   privacy during meetings and telephone calls. Other courts have recognized that this

11   balancing of interests is appropriate. *See Wolff*, 418 U.S. at 577 (finding constitutional a

12   policy that allowed prison officials "to open [incoming legal] mail in the presence of

13   inmates" because it ensured that "the mail would not be read," while permitting mail

14   inspections to protect against "[t]he possibility that contraband will be enclosed in letters,

15   even those from apparent attorneys"); *Guajardo-Palma v. Martinson*, 622 F.3d 801, 805

16   (7th Cir. 2010) ("Protection of the privacy of attorney mail in this fashion is imperfect;

17   the prison employee who opens the letter will have to glance at the content to verify its

18   bona fides. But the imperfection is necessary to protect the prison's interest in security –

19   and is lessened by allowing prisoners to engage in unmonitored phone conversations with

20   their lawyers.").

21

22   762 F.3d at 906 (emphasis added). Nordstrom argued that the phrase "suspicious
     features" is key – that the court of appeals drew a clear distinction between a visual
23   proper inspection for features such as pictures, maps, and tables, on one hand, and an
     improper inspection that involved reading words, on the other hand. The Court does not
24   agree. Nordstrom fails to address a later part of the opinion where the Ninth Circuit more
     fully addresses this point: "We emphasize that nothing prevents the ADC from *inspecting*
25   an inmate's outgoing mail, in his presence, to make sure that it does not contain, for
     example, a map of the prison yard, the time of guards' shift changes, escape plans, or
26   contraband." *Id.* at 910-11 (emphasis in original). The court of appeals does not use the
     phrase "suspicious features" in this part of the opinion, and it specifically includes
27   "escape plans" as an example of what guards may look for. If non-word "suspicious
     features" were the only things guards could try to detect under the Ninth Circuit's test,
28   surely the phrase would have been repeated in this and other parts of the opinion. The
     phrase appears only once.

1

2.	**Applying the Test to This Case.**

2	Admittedly, the dividing line between prohibited "reading" and permissible

3	"scanning" is elusive, but the Court need not find the precise dividing point.  The Court

4	concludes that ADC's policy falls on the permissible side of the line.  ADC's legal mail

5	policy provides that:

6

> All outgoing legal mail shall be brought to the mail room by the inmate,
> where the letter will be *inspected* for contraband, but *shall not be read by*
> *staff*, and *scanned* to ensure it is in fact legal mail. . . .  Staff may *inspect*
> the document but only to the extent necessary to determine if the mail
> contains contraband, or to verify that its contents qualify as legal mail and
> do not contain communications about illegal activities.

7

8

9

10

11	Doc. 28-2 at 3 (emphasis added).  ADC requires officers who process legal mail to

12	undergo training.  Officers are trained to scan legal mail by looking for keywords or mail

13	that utilizes different fonts, which may indicate an alteration or hidden message.

14	Doc. 67-9 at 197-98.  Officers are trained not to read letters line-by-line.  *Id*. at 198.[8]

15	Sergeant McClincy, head of the Eyman Complex mail system, testified credibly

16	that this policy is followed.  He testified that officers "inspect" outgoing legal mail for the

17	presence of contraband and whether it qualifies as legal mail, taking, in his experience,

18	about 15 seconds per page to review handwritten documents.  Doc. 67-9 at 167-69.

19	Moreover, the parties stipulated that ADC's policy, as set forth in Director's Instruction

20	333, was implemented and is followed, and that ADC's prior directive was also

21	implemented and followed.  *Id*. at 223-24.

22	Nordstrom argues that Defendant has failed to establish legitimate penological

23	interests in inspecting inmate legal mail because "ADC failed to adduce even a single

24	episode in the entire history of the Arizona prison system [where] a genuine letter by a

25	prisoner to his attorney had violated the law or endangered security."  Doc. 73 at 10.  The

26

27	_____

[8] Although the policy calls for inmates to bring outgoing legal mail to the mail room, the Court understands that the May 2, 2011 incident occurred at Nordstrom's cell because he is on death row and is not permitted to move freely about the Browning facility.  *See* Doc. 28-2 at 3.

28

Court finds this argument unpersuasive for three reasons.  First, the Ninth Circuit, in this case, has already held that prison officials may inspect or scan outgoing legal mail in order to preserve prison security.  Second, the evidence shows that inmates send criminal communications in mail masquerading as attorney-client correspondence, sometimes even appropriating the names and addresses of licensed attorneys.  Third, unrefuted evidence shows that licensed Arizona attorneys have been involved in criminal activities with inmates, including aiding in criminal communications.  This sad fact shows that prison officials cannot assume a communication does not present a security threat simply because it is addressed to or from a licensed attorney.

Nordstrom argues that his allegation that Officer Hawthorne read his legal mail on May 2, 2011 is undisputed and establishes a Sixth Amendment violation sufficient to justify the entry of a permanent injunction.  *See* Doc. 69 at 6-7.  The Court does not agree.  Nordstrom does not claim that Hawthorne read the letter aloud.  He asserts only that Hawthorne's eyes were on the pages of the letter for about 15 seconds.  Doc. 67-9 at 40.  This is consistent with the testimony of other officers that handwritten letters can be scanned for key words in about 15 seconds.  *See id.* at 167-69.  Moreover, as noted above, the testimony of Officers McClincy, Davis, Nail, Ping, and Reyna persuade the Court that ADC officers are taught to scan legal mail and not read it.  The Court does not find that Officer Hawthorne read Nordstrom's letter in the sense prohibited by the Ninth Circuit's decision in this case.

Even if this Court were to conclude that Hawthorne actually read, rather than simply scanned and inspected, Nordstrom's letter, Nordstrom's request for a permanent injunction would fail.  Hawthorne is no longer a party in this case.  Thus, if his actions are to justify a permanent injunction against Defendant, they must have been pursuant to a policy or practice sanctioned by Defendant.  As discussed above, Defendant's legal mail policy and practice comport with the Sixth Amendment.

Nordstrom contends that Director Ryan's July 28, 2011 response to Nordstrom's grievance amounts to an admission that ADC's officers read legal mail.  Doc. 69 at 6-7.

Although inartfully drafted, Director Ryan's response appears to be attempting to draw the same distinction that the Ninth Circuit drew between scanning and inspecting on one hand, and reading on the other.  *See* Doc. 3 at 31 ("All outgoing letters to an inmate's attorney or to a judge or court . . . *shall not be read or censored* but *shall be inspected for contraband*. . . . Staff is *authorized to scan and is not prohibited from reading the mail to establish the absence of contraband* and ensure the content of the mail is of legal subject matter.") (emphasis added).  Like the Ninth Circuit, Director Ryan appears to be saying that line-by-line reading is prohibited, while reading is permitted only as necessary to permit reviewing officers to complete their scan for contraband or evidence of illegal activity.  This is consistent with the Ninth Circuit's directives in *Nordstrom*.  762 F.3d at 910-11.

Finally, Nordstrom argues that ADC's legal mail policy is unconstitutional to the extent it allows prison officials to scan legal mail for the purpose of verifying that it contains legal subject matter.  *See* Doc. 69 at 15.  As noted, the Ninth Circuit has already concluded that scanning legal mail is permissible under the Sixth Amendment.  The question, then, is whether it becomes impermissible when its purpose is to confirm that the mail is actually of a legal nature, rather than merely looking for escape plans, guard shift times, and the like.

"Contraband," as set forth in Director's Instruction 333, is defined to include "[a]ny non-legal written correspondence or communication *discovered as a result of scanning* incoming or outgoing legal mail."  Doc. 28-1 at 5 (emphasis added).  "Legal mail," as set forth in Order 902, is defined as "[a]ny letters to or from an inmate's attorney as defined above, or to or from a judge or to or from a court of law."  Doc. 67-10 at 22.[9]  When the two definitions are read together, as they ought to be, there is no Sixth Amendment problem.  Reviewing officers are permitted to seize as contraband any non-

---

[9] During oral argument, Defendant's counsel stated that ADC did not have a policy that defined the term "legal mail."  Defendant subsequently filed a notice of errata and unopposed motion to supplement the record (Docs. 81, 82) that pointed to this definition in Order 902 (Doc. 67-10 at 22).

legal written communications discovered as a result of a legal mail scan. Under ADC policy, legal mail includes any letters to or from an inmate's attorney; it does not require that the letters' subject matter be "legal" in the traditional sense. Thus, ADC could not seize a letter from an attorney to an inmate, even though it includes an article about sports.[10]  *See* Doc. 67-9 at 21-22. ADC's legal mail policy, as set forth in Order 902 and Director's Instruction 333, simply does not authorize the conduct of which Nordstrom complains.

The weight of the evidence shows that Defendant's legal mail practices also do not authorize such an independent review. Officers are trained not to read letters line-by-line; they are trained to scan and inspect. *Id.* at 198. During the inspection, officers confirm that correspondence is actually legal mail by scanning the addressee information and the general content of the letter, looking for different fonts, micro-writing, or keywords indicating that a letter may not actually be legitimate legal mail. *See id.* at 197-98. If the inspecting officer suspects that the letter is not actually legal mail, he seizes the letter and allows his supervisor to handle it. *Id.* at 162-63. Ultimately, the Special Security Unit will be brought in to open the letter in the inmate's presence. *Id.* at 179-80. Critically, when an officer suspects that a piece of purported legal mail is not what it claims to be, there is no evidence that the officer then reads the letter.

It is important to note the type of evidence that is not contained in the record. Nordstrom has not produced any evidence that ADC has ever confiscated a piece of his legal mail because its subject matter did not appear to be legal in nature.[11]  Similarly,

---

[10]  Associate deputy warden Hope Ping testified to a broader definition of contraband. *See* Doc. 67-9 at 190-91. Ping specifically testified that such a letter would be considered contraband subject to seizure. *Id.* Her testimony, standing alone, is insufficient to overcome the significant amount of evidence, discussed below, to show that Defendant does not have a practice of conducting an independent review to confirm that legal mail addresses only traditional legal subject matter.

[11]  Although not addressed by either party, it does not appear that Nordstrom has standing to challenge this portion of ADC's legal mail policy or practices. *See Madsen v. Boise State Univ.*, 976 F.2d 1219, 1220-21 (9th Cir. 1992) (collecting cases where plaintiffs lacked standing to challenge a policy that had not been applied to them because it would be a lawsuit "based on the . . . policy in the abstract").

- 24 -

1   Nordstrom has not produced any evidence that any other inmate's letter was seized for

2   that reason.  In fact, in the only other concrete example cited by Nordstrom – involving

3   Officer Nail and inmate Hulsey – the inspecting officer delivered the piece of purported

4   incoming legal mail despite indicia that its subject matter was not legal in nature.  *See*

5   Docs. 23 at 3-4; 67-9 at 149-51.

6       The Supreme Court has cautioned that "a restriction on [outgoing] inmate

7   correspondence that furthers an important or substantial interest of penal administration

8   will nevertheless be invalid if its sweep is unnecessarily broad."  *Martinez*, 416 U.S. at

9   413-14.[12]   During the evidentiary hearing and in his brief, Nordstrom proposed

10  alternative legal mail inspection systems that Defendant could adopt to strike a different

11  balance between ADC's legitimate penological interests and inmates' Sixth Amendment

12  rights.  *See* Docs. 67-9 at 89-90; 69 at 15-18.  For example, Nordstrom proposed that

13  prison officials "devise a code system or even a phone system where if they want to make

14  sure it's [a licensed attorney], they can actually call [the attorney's] law office and

15  confirm" that it is, in fact, the attorney who wrote the letter.  Doc. 67-9 at 90.  But in a

16  decision issued several months after *Martinez*, the Supreme Court found that such a

17  system would be overly burdensome to prison officials.  *Wolff*, 418 U.S. at 576 ("If

18  prison officials had to check in each case whether a communication was from an attorney

19  before opening it for inspection, a near impossible task of administration would be

20  imposed.").  Nordstrom also suggested that prison officials simply not inspect legal mail

21  addressed to or sent from licensed attorneys.  But as shown above, the evidence in this

---

22

23      [12] The Supreme Court subsequently limited *Martinez* "to regulations concerning

24  outgoing correspondence," which, the Court found, raise security interests that "are of a
    categorically lesser magnitude than the implications of incoming materials."

25  *Thornburgh*, 490 U.S. at 413-14.  Here, ADC has provided more than enough evidence to
    allow this Court to conclude that prison officials have legitimate security interests in

26  ensuring that inmates are not abusing their right to send mail, including purported legal
    mail.   *See* Section II(A), *supra*.  And despite the parties' overwhelming focus on

27  outgoing legal mail, the Court also notes that ADC's legal mail policy and practices
    apply to both incoming and outgoing correspondence.  To the extent that *Turner v.*

28  *Safley*, 482 U.S. 78 (1987), rather than *Martinez*, applies, as with incoming legal mail,
    Defendant has satisfied the less demanding standard that ADC's legal mail policy is
    "reasonably related to legitimate penological interests."  *See id.* at 89.

case established that licensed attorneys have been involved in criminal conspiracies and criminal communications with inmates in Arizona.  Given the nature and extent of the legal mail problems faced by Arizona prison officials, the Court cannot conclude that their legal mail policy or practices are unnecessarily broad.

In summary, applying the standard established by the Ninth Circuit in this case, the Court concludes that Nordstrom has not established a Sixth Amendment violation. The evidence shows that ADC's legal mail policy and practice authorize officers to scan and inspect – but not read – inmates' legal mail in their presence.  Although Nordstrom has provided evidence that he is reluctant to put certain things in letters to his attorney, the evidence shows that Nordstrom has adequate alternative means of communicating fully with his lawyers and that their effectiveness has not been compromised by the ADC policy and practice.

**B.     First Amendment.**

Nordstrom argues that his First Amendment free speech rights are violated by Defendant's legal mail policy and practices.  Nordstrom has failed to prove this claim.

The First Amendment, as incorporated against the states by the Fourteenth Amendment, prohibits states from "abridging the freedom of speech."  U.S. Const. amend. I.  Although inmates enjoy a First Amendment right to send and receive mail, *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995), these rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security."  *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)).  A regulation that impinges on an inmate's First Amendment rights is valid if that regulation "'is reasonably related to legitimate penological interests.'"  *Frost v. Symington*, 197 F.3d 348, 354 (9th Cir. 1999) (citing *Turner*, 482 U.S. at 89).  Deterring criminal activity and maintaining prisoner security are legitimate penological interests that justify regulations on prisoner mail.  *Nordstrom*, 762 F.3d at 906; *O'Keefe v. Van Boening*, 82 F.3d 322, 326 (9th Cir. 1996).

- 26 -

As discussed above, the evidence shows that Defendant has legitimate penological interests in maintaining institutional security.  The abuse of inmates' right to send and receive legal mail poses a security threat in several ways: it can be used to introduce contraband into ADC's facilities, to facilitate criminal activity within the prison's walls, and to facilitate criminal activity on the outside.  The legitimate penological interest in mitigating such threats justifies ADC's legal mail policy and practices.  *Nordstrom*, 762 F.3d at 906; *O'Keefe*, 82 F.3d at 326.

### C.      Fourteenth Amendment.

Nordstrom contends that his Fourteenth Amendment right of access to the courts is violated by Defendant's policy and practice.  He has failed to prove this claim as well.

The Fourteenth Amendment guarantees inmates meaningful access to the courts.  *Ching v. Lewis*, 895 F.2d 608, 609 (9th Cir. 1990) (citing *Bounds v. Smith*, 430 U.S. 817, 822 (1977)).  This constitutional right "guarantees no particular methodology but rather the conferral of a capability – the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts."  *Lewis v. Casey*, 518 U.S. 343, 356 (1996).  To bring such a claim, an inmate must establish that he suffered an actual injury, such as an inability to file a complaint or defend against a charge.  *Id.* at 351-53; *see also Jones v. Blanas*, 393 F.3d 918, 936 (9th Cir. 2004) (affirming grant of summary judgment where inmate "did not allege injury, such as inability to file a complaint or defend against a charge, stemming from the restrictions on his access to the law library").

Nordstrom has failed to prove any actual injury resulting from Defendant's legal mail policy and practice.  The undisputed evidence shows that, despite ADC's policy and practice, Nordstrom has always been able to communicate with his lawyers.  *See* Docs. 67-1 at 27, 52; 67-9 at 49-50.  Nordstrom's injury evidence – that his ability to communicate some types of information in writing to his attorneys has been chilled – falls short of the actual harm required for a Fourteenth Amendment claim.  *Lewis*, 518 U.S. at 351-53; *Jones*, 393 F.3d at 936.[13]

---

[13] To the extent that Nordstrom asserts that his access to the courts claim stems

**IT IS ORDERED**:

1.      Judgment is entered against Plaintiff on all claims in his complaint and his request for declaratory and injunctive relief (Doc. 5) is **denied**.

2.      Defendant's motion to supplement (Doc. 81) is **granted**.

3.      Plaintiff's motion to supplement (Doc. 83) is **denied as moot**.

4.      The Clerk shall enter a written judgment in favor of Defendant and terminate this action.

Dated this 5th day of February, 2016.

_David G. Campbell_
David G. Campbell
United States District Judge

---

from the First Amendment, his claim must still fail for lack of an actual injury.  *See Strong v. Woodford*, 428 F. Supp. 2d 1082, 1085-86 (C.D. Cal. 2006) (citing *Lewis*, 518 U.S. at 351-53) (dismissing inmate's First Amendment access to the courts claim where he failed to establish actual injury).